No. 79,533

THE LEGISLATIVE COORDINATING COUNCIL, *Petitioner*, v. THE HONORABLE DAN STANLEY, SECRETARY OF THE DEPARTMENT OF ADMINISTRATION, and SHIRLEY A. MOSES, DIRECTOR OF ACCOUNTS AND REPORTS, *Respondents*.

(957 P.2d 379)

Opinion filed April 17, 1998.

*Robert J. Nugent*, assistant revisor of statutes, argued the cause, and *Norman J. Furse*, revisor of statutes, and *Renae Jefferies*, assistant revisor of statutes, were with him on the briefs for petitioner.

*John W. Campbell*, senior deputy attorney general, argued the cause, and *Robert E. North*, staff attorney, Kansas Department of Administration, and *Carla J. Stovall*, attorney general, were with him on the brief for respondents.

The opinion of the court was delivered by

DAVIS, J.: This is an original action for writ of mandamus brought by the Legislative Coordinating Council (LCC) against respondents Dan Stanley, the Secretary of the Department of Administration, and Shirley A. Moses, the Director of Accounts and Reports. The LCC seeks an order of mandamus directing the director of accounts and reports to pay vouchers submitted by the LCC for court costs and attorney fees in an election contest for a seat in the Kansas House of Representatives.

The subject matter of this case originally came before this court on the LCC's petition for writ of mandamus in *Legislative Coor-*

*dinating Council v. Frahm*, 262 Kan. 144, 936 P.2d 267 (1997). This court did not reach the merits of the case, determining instead that the LCC had no authority or standing to bring an action in mandamus while the legislature was in session. 262 Kan. at 155. The legislature adjourned on May 27, 1997. The present action was commenced while the legislature was not in session. In the interim, Sheila Frahm has been succeeded as Secretary of the Department of Administration by Dan Stanley, which accounts for the change in heading in this case.

The parties in *Legislative Coordinating Council v. Frahm* stipulated to the facts and legal issues for resolution. With a few minor additions, the facts and legal issues remain the same in this case. The stipulated facts from *Legislative Coordinating Council v. Frahm* are as follows:

" '1. On December 21, 1994, Joe Shriver was declared the winner of the election for 79th District State Representative over Danny Jones by then Kansas Secretary of State, Bill Graves.

" '2. Jones filed suit contesting the elections and on January 6, 1995, the Cowley County District Court determined the election to be a tie vote and under K.S.A. 25-1452 waived the costs of the contest and held, in part:

'3. In the interests of justice, the costs of this contest are hereby waived and should therefore be paid by the State of Kansas in a special appropriation made therefore, pursuant to K.S.A. 25-1452. It is the specific recommendation of this court that the costs of this case include a reasonable sum for attorneys' fees for both the parties.'

" '3. On January 30, 1995, Speaker Shallenburger appointed a select committee of six members of the Kansas House of Representatives to hear the matter and report to the full House pursuant to K.S.A. 25-1451(b).

" '4. On February 9, 1995, the select committee reported to the membership of the House that the contested election had resulted in a tie vote between Jones and Shriver. The committee recommended that the outcome of the election should be decided by lot. The report of the select committee did not mention payment of court costs or attorneys' fees in this matter.

" '5. On February 10, 1995, the Speaker announced that by mutual agreement of the candidates and concurrence of the leadership of the Republican and Democratic parties in the House, the election for the Office of Representative of the 79th District would be determined by drawing lots. The announcement, as stated in the Journal of the House, did not mention payment of court costs or attorneys' fees in this matter. Jones won the drawing and was seated.

" '6. During the 1995 legislative session, both Senate Bill No. 95 and House Bill No. 2085 contained appropriations provisions for Legislative expenses. HB

2085 did not mention payment of court costs or attorneys' fees in this matter. SB 95 was amended by motion of the House Minority Leader to specifically appropriate money to pay Jones' and Shriver's attorneys' fees. The day after SB 95 was so amended the full House adopted the conference committee report on HB 2085. HB 2085, which included appropriations for legislative operational costs, became law on July 1, 1995.

" '7. On motion of Senator Bogina to non-concur to the House amendments to SB 95, a conference committee was appointed. Senators Bogina, Emert and Rock, as well as Representatives Jennison, Carmody, and Helgerson met as the conference committee on SB 95. On two occasions the committee agreed to disagree and SB 95 remained in conference committee during the 1995 legislative session.

" '8. On May 30, 1995, Speaker Pro Tem Susan Wagle requested an Attorney General's Opinion asking whether either HB 2085 or its 1994 predecessor (1994 Kan. Sess. Laws Ch. 255) authorized the LCC to pay Jones' and Shriver's court costs and attorneys' fees. On June 30, [1995], the Attorney General opined: "The costs incurred in the contest of an election in the seventy-ninth representative district may not be paid for from appropriation set forth in L. 1994, ch. 255, § 3 or section 3 of 1995 house bill no. 2085."

" '9. On August 21, 1995, Speaker Shallenburger pointed out to the Council that because 1995 Senate Bill No. 95 was not passed by the Legislature, the court costs, transcription expenses and attorneys' fees in the contested election case of *Jones v. Shriver*, District Court of Cowley County, Kansas, had not been paid. Speaker Shallenburger moved that the court costs, transcription expenses; and attorney fees as specified in 1995 Senate Bill No. 95, (as amended by House Committee of the Whole) be paid from the operations (including official hospitality) account of the Legislature. Representative Sawyer seconded the motion. In discussion, members of the Council considered the statute relating to payment of costs of contests of elections; that the district judge who heard the case ordered the costs of the election .contest to be paid by the state and recommended that the costs of the case include a reasonable sum for attorney fees for both parties; an opinion of the Attorney General on the matter; the amount of the costs, including attorney fees, authorized for payment in 1995 Senate Bill No. 95 (as amended by House Committee of the Whole); and that 1995 Senate Bill No. 95 (as amended by House Committee of the Whole) authorized the payment of attorney fees in the matter from the operations (including official hospitality) account of the Legislature. The motion carried. Senator Moran voted against the motion.

" '10. On August 24, 1995, the LCC submitted a payment voucher, V 428, to the Division of Accounts and Reports of the Department of Administration seeking payment of Danny Jones' attorney fees in *Jones v. Shriver* to the law firm of Patterson, Nelson, Nolla & Witteman, L.C. in the amount of $19,054.15.

" '11. On August 24, 1995, the LCC submitted a payment voucher, V 427, to the Division of Accounts and Reports of the Department of Administration seek-

ing payment of Danny Jones' attorney fees in *Jones v. Shriver* to Eric Rucker, Attorney at Law, in the amount of $5,624.75.

" '12. On August 24, 1995, the LCC submitted a payment voucher, V 426, to the Division of Accounts and Reports of the Department of Administration seeking payment of Danny Jones' attorney fees in *Jones v. Shriver* to Dale Sprague, Attorney at Law, in the amount of $321.10.

" '13. On August 24, 1995, the LCC submitted a payment voucher, V 424, to the Division of Accounts and Reports of the Department of Administration seeking payment of docket fee, witness fees and faxed copies in *Jones v. Shriver* to the District Court of Cowley County in the amount of $466.12.

" '14. On August 24, 1995, the LCC submitted a payment voucher, V 425, to the Division of Accounts and Reports of the Department of Administration seeking payment of Joe Shriver's attorney fees in *Jones v. Shriver* to Victor Miller, Attorney at Law in the amount of $15,000.

" '15. On August 24, 1995, the LCC submitted a payment voucher, V 423, to the Division of Accounts and Reports of the Department of Administration seeking payment of transcription costs and fax costs in *Jones v. Shriver* to Deanne M. Johnson, CSR, in the amount of $1,164.

" '16. The Director of Accounts and Reports, upon receipt of the above mentioned vouchers, consulted with the Attorney General and afterwards refused to process the vouchers for payment.

" '17. On October 18, 1995, the LCC convened and reviewed a letter to the Director of Accounts and Reports from the Attorney General reaffirming the opinion expressed in Attorney General Opinion 95-66. The Council then carried a motion of Representative Snowbarger, seconded by Representative Wagle, to again direct the Director of Accounts and Reports to pay the court costs and attorney fees in the contested election case. Only Senator Moran voted against the motion.

" '18. October 20, 1995, Senator Burke, Chairperson of the Legislative Coordinating Council, sent a letter to Sheila Frahm, then Secretary of Administration, discussing the Council's views and conveying to the Secretary the motion adopted by the Council's views at its October 18, 1995, meeting.

" '19. October 20, 1995, Respondent Moses wrote a letter to Emil Lutz, Director of Legislative Administrative Services, returning the vouchers unpaid, citing Kansas Attorney General Opinion 95-66 as the basis for denial of payment.

" '20. During the November 16, 1995 LCC meeting, Representative Snowbarger inquired about the current status of the payment of court costs and attorney fees in the contested election case of *Jones v. Shriver*. Mr. Lutz indicated that the original vouchers were returned to him by the Department of Administration but, that based on the direction of the [LCC] at its October 18, 1995 meeting, he had again forwarded the vouchers to the Department of Administration, Division of Accounts and Reports. Mr. Lutz indicated that the vouchers had not been returned to him by the Department.

" '21. Also during the November 16, 1995, LCC meeting, Representative Wagle inquired about the possibility of commencing a court action in mandamus to enforce the payment of the vouchers. Concerns were expressed that the time before the upcoming legislative session was not adequate to allow for a court action, since the matter could be resolved at the next legislative session. President Burke requested that a bill be prepared by the Revisor of Statutes Office which would address the issue of payment of court costs from money appropriated to the legislature in contested election cases which involve candidates for the state legislature.

" '22. On December 29, 1995, the LCC pre-filed House Bill 2609, an amendment to K.S.A. 25-1452, which would provide, in part,

"The court, in the interests *interest* of justice may waive any costs assessed pursuant to this section in which case the costs shall be paid by the state from any appropriations therefor *or, in a case of the contest of a state legislative election, from appropriations available of expenses of the legislature.*"

"HB 2609 was introduced in the House on January 8, 1996 and referred to the House Committee on Governmental Organization and Elections where it remained for the duration of the session.

" '23. On January 22, 1996, the LCC expressed concerns that the failure of Respondents to pay the vouchers "raised serious questions of the constitutional separation of powers between the legislative and executive branch of government" and while the Legislature was in regular session directed the Revisor of Statutes to:

". . . represent the Legislative Coordinating Council and the Legislature as legal counsel in this matter, to bring the appropriate court action to secure the payment of attorney fees and court and transcription costs in the contested election case of *Jones v. Shriver*, and the Revisor of Statutes was directed to file the appropriate court action in this matter as legal counsel and to prosecute the action to conclusion."

" '24. On January 30, 1996, Senate Bill No. 561 was introduced by the Senate Committee on Elections, Congressional and Legislative Apportionment and Governmental Standards. Under Senate Bill No. 561, K.S.A. 25-1452 would be amended to read, in part: "The state shall not pay any costs nor pay any attorney fees of the contestant or contestee associated with any contest of election."

" '25. Senate Bill No. 561 passed the Senate by a vote of 34 to 5, but failed to be passed out of the House Committee on Governmental Organization and Elections, and was not enacted into law.

" '26. On January 25, 1996, the House Committee on Appropriations introduced House Bill No. 2724, a major appropriations bill which includes reductions in fiscal year 1996 (FY 96) appropriations. In § 37 of House Bill No. 2724, as amended by both the House Appropriations Committee and the House Committee of the Whole, $40,000, the amount the LCC wants to pay Jones' and Shriver's attorneys, was removed from the FY 96 appropriation for legislative operations. House Bill No. 2724 was not enacted into law.

" '27. In the 1996 regular legislative session, the Senate Ways and Means Committee introduced Senate Bill No. 426 on January 9, 1996. This bill also reduced the legislature's FY 96 operating budget. In committee action, $41,630.21 was removed from the legislature's FY 96 operating budget. Senate Bill No. 426 was not enacted into law." 262 Kan. at 145-48.

As additional facts, the respondents note that since Dan Stanley assumed the position of Secretary of the Department of Administration on November 11, 1996, the LCC has never presented him with a request to pay the expenses in question. The respondents admit that such a presentation would result in denial. The respondents also state, and the LCC agrees, that the LCC did not attempt to secure an appropriation from the Kansas Legislature in the 1997 session for the payment of all costs, including attorney fees. With these minor additions, the facts remain the same as set forth above in *Legislative Coordinating Council v. Frahm.*

Parties to the Action

The petitioner, the LCC, is a seven-member board made up of the leadership of the Kansas House and Senate. K.S.A. 46-1201. The general powers and functions of the LCC are described in K.S.A. 46-1202, the provisions of which are set forth fully in this opinion.

The respondents are the Secretary of the Department of Administration and the Director of Accounts and Reports. The Division of Accounts and Reports is part of the Department of Administration and was established by the legislature in 1972:

"There is hereby established within and as a part of the department of administration, a division of accounts and reports, the head of which shall be the director of accounts and reports. Under the supervision of the secretary of administration, the director of accounts and reports shall administer the division of accounts and reports. The director of accounts and reports shall be in the unclassified service under the Kansas civil service act and shall be appointed by the secretary of administration." K.S.A. 75-3727a.

The respondents are responsible for paying any account, bill, claim, refund, or demand on funds in the state treasury when determined by the director to be a valid obligation or obligations incurred in

accordance with applicable laws and rules and regulations. K.S.A. 75-3731(a) provides:

"Unless a claim is ordered paid by act of the legislature, the director of accounts and reports may refuse to pay any account, bill, claim, refund or demand on funds in the state treasury when the director determines that it is not a valid obligation or was not incurred in accordance with applicable laws and rules and regulations."

### Relief Requested

The LCC seeks a writ of mandamus in accord with K.S.A. 60-801 directing the respondents to pay vouchers submitted for costs and attorney fees in an election contest for a seat in the Kansas House of Representatives. "Mandamus is a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." K.S.A. 60-801.

Mandamus is an appropriate proceeding for the purpose of compelling a public officer to perform a clearly defined duty, one imposed by law and not involving the exercise of discretion. *State ex rel. Stephan v. Finney*, 251 Kan. 559, 567, 836 P.2d 1169 (1992). While Article 3, § 3 of the Kansas Constitution provides original jurisdiction in this court for proceedings in mandamus, relief is discretionary. 251 Kan. at 567. This court will entertain a mandamus action if the issue is a matter of great public interest and concern. See *Sedlak v. Dick*, 256 Kan. 779, 786, 887 P.2d 1119 (1995).

The petitioner asks this court to interpret statutory and constitutional language which defines its authority and in particular its authority over the respondents. Mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that another adequate remedy at law exists. *State ex rel. Stephan v. Parrish*, 257 Kan. 294, 296, 891 P.2d 445 (1995). The burden to show the right to this extraordinary remedy is on the petitioner. *State, ex rel., v. Paulsen*, 204 Kan. 857, Syl. ¶ 2, 465 P.2d 982 (1970).

## RESPECTIVE POSITIONS OF THE PARTIES

### I. Legislative Coordinating Council

The LCC argues that the payment of costs, including attorney fees in the contested election, became a mandatory obligation of the State under the provisions of K.S.A. 25-1452. The LCC contends that these expenses fall within the category of general operation expenses for the legislature and, thus, no specific line item appropriation is necessary. The LCC further contends that the refusal of the respondents to pay the expense vouchers is a violation of doctrine of separation of powers. The LCC asks this court to interpret K.S.A. 25-1452 as well as its powers *vis-a-vis* the respondents and to direct the respondents to pay the expense vouchers in question.

### II. Secretary of Administration and Director of Accounts and Reports

The respondents assert that the payment of costs and attorney fees arising from the election contest are not valid obligations of the State and were incurred in contravention of Kansas law. Thus, they assert that under K.S.A. 75-3731(a), they may rightfully refuse payment. The respondents cite two reasons for their claim that the debts are illegal. First, the respondents argue that payment of the LCC's vouchers would violate campaign finance laws and specifically K.S.A. 25-4169a. Second, the respondents argue that payment violates Article 2, § 24 of the Kansas Constitution, which provides that "[n]o money shall be drawn from the treasury except in pursuance of a specific appropriation made by law."

## ISSUES

The parties stipulated to what they considered the legal issues to be in the original action of *Legislative Coordinating Council v. Frahm*, 262 Kan. 144, 936 P.2d 267 (1997). We mention these issues in our conclusion to this opinion and give an answer to each of the stipulated issues. However, for the purposes of this opinion, we elect to identify the following issues in the following order for resolution: (1) the respondents' contention that payment of the vouchers is in violation of Kansas law, specifically K.S.A. 25-4169a;

(2) an interpretation of K.S.A. 25-1452 relating to all costs before the district court and K.S.A. 25-1451 relating to the ultimate resolution of this election contest; (3) whether the petitioner is an agent of the legislature; (4) whether the legislature's failure to pass S.B. 95 specifically authorizing the payment of costs and fees prevents those fees from being paid; (5) whether Article 2, § 24 of the Kansas Constitution prohibits payment of costs and fees; (6) whether costs and fees qualify as an operational expense within the general appropriation fund of H.B. 2085; and (7) whether the respondents' refusal to pay the vouchers submitted violated the doctrine of separation of powers.

(1) The respondents' contention that payment of the vouchers is in violation of Kansas law, specifically K.S.A. 25-4169a.

In support of their contention that the payment of attorney fees is illegal, the respondents argue that payment of the vouchers would be a violation of K.S.A. 25-4169a, which generally provides that no officer or employee of the State of Kansas shall use public funds for the purpose of influencing the election of any candidate to state office. K.S.A. 25-4169a provides:

"(a) *No officer or employee of the state of Kansas*, any county, any unified school district having 35,000 or more pupils regularly enrolled, any city of the first class or the board of public utilities of the city of Kansas City, Kansas, *shall use or authorize the use of public funds* or public vehicles, machinery, equipment or supplies of any such governmental agency or the time of any officer or employee of any such governmental agency, for which the officer or employee is compensated by such governmental agency, *for the purpose of influencing the nomination or election of any candidate to state office or local office*. The provision of this section prohibiting the use of time of any officer or employee for such purposes shall not apply to an incumbent officer campaigning for nomination or reelection to a succeeding term to such office or to members of the personal staff of any elected officer.

"(b) Any person violating the provisions of this section shall be guilty of a class C misdemeanor." (Emphasis added.)

The question of whether payment of the vouchers submitted by the LCC representing the costs and attorney fees associated with the election contest between Jones and Shriver for a seat in the Kansas House of Representatives is an expenditure of public funds by a public officer *for the purpose of influencing the nomination*

*or election of any candidate to state office or local office* is a question of law. Our review is, therefore, unlimited. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 514, 930 P.2d 1366 (1997).

An immediate and glaring problem with the respondents' position is that it conflicts with the express language contained in K.S.A. 25-1452, which creates a State obligation for payment of costs in an election contest under circumstances set forth therein. The respondents' interpretation of K.S.A. 25-4169a would make such payment of costs under K.S.A. 25-1452 illegal. We reject the respondents' construction and follow our basic rule of statutory construction to " 'as far as practicable, . . . reconcile the different provisions [K.S.A. 25-1452 and K.S.A. 25-4169a] so as to make them consistent, harmonious, and sensible.' " *Todd v. Kelly,* 251 Kan. 512, 516, 837 P.2d 381 (1992) (quoting *In re Marriage of Ross*, 245 Kan. 591, 594, 783 P.2d 331 [1989]).

Nevertheless, the respondents contend that Advisory Opinion No. 95-5 issued by the Kansas Commission on Governmental Standards and Conduct (KCGSC) supports their position that the vouchers represent campaign expenses. See 14 Kan. Reg. 316 (1995). According to the respondents, the purpose of the attorney fees expended in an election contest are to influence the election. In that opinion, the commission found that a candidate who has filed an election contest is still a candidate until a termination report is filed and, therefore, any funds for legal fees in the contest are campaign funds. The respondents cite the following provisions of that opinion:

"In answer to your first question, when a candidate who has been defeated in a general election contests the certification of his or her opponent, we believe the individual is still a 'candidate' until a termination report is filed.

. . . .

". . . Anyone donating money to a defeated candidate contesting the election certification is given such money 'for the purpose of influencing the nomination or election of any individual to state or local office. 14 Kan. Reg. 317.

"[W]e suggest that any donations received by the candidate to be used for legal fees associated with the contested certification be received as campaign funds. 14 Kan. Reg. 317."

The LCC observes that the above opinion concerns campaign expenses under the Campaign Finance Act. The Campaign Fi-

nance Act is a statutorily defined act under K.S.A. 25-4142 *et seq.* and is separate from statutes applicable to contested elections, K.S.A. 25-1434 through 25-1452. The LCC notes that the provisions of the Campaign Finance Act deal with contributions for actively campaigning candidates for office, while the contested election statutes deal with what happens *after* the election results are in. See K.S.A. 25-1436. The contested election statutes specifically state that in a contest the parties shall be called the contestant and contestee, removing any doubt as to their status. See K.S.A. 25-1437.

The LCC also observes that KCGSC Advisory Opinion No. 95-5 repeatedly states that its answers to the questions presented are based upon the definition of a "candidate under the Campaign Finance Act." See 14 Kan. Reg. 316. According to the LCC, the KCGSC opinion does not concern the questions presented in light of K.S.A. 25-1452.

The LCC argues that the KCGSC advisory opinion instead deals primarily with a *candidate* soliciting funds and using them to pay legal fees while still a *candidate*. See 14 Kan. Reg. 316. (Emphasis added.) The LCC further observes that the KCGSC advisory opinion makes it clear that for acts contained in chapter 25, other than the Campaign Finance Act, an individual ceases to be a candidate upon withdrawing or upon the Board of Canvassers announcing a winner and a loser: "However, under the remainder of chapter 25, an individual ceases to be a candidate upon withdrawing the declaration of intent or nomination petition, *or when the Board of Canvassers announces the winner and loser of each election.*" 14 Kan. Reg. 316.

We generally agree with the contentions of the LCC. At the time the expenses represented by the vouchers were incurred, Jones and Shriver were not candidates but were contestant and contestee under the provisions of K.S.A. 25-1437. We conclude the funds spent on costs and attorney fees in this election contest were not campaign expenses spent for the purpose of influencing the election. The election had been completed in that all ballots had been cast. The costs and attorney fees in this case were incurred for the purpose of insuring that the ballots be accurately counted and that

an appropriate decision be made by the Kansas House of Representatives under the provisions of K.S.A. 25-1451 and K.S.A 25-1452.

(2) Interpretation of K.S.A. 25-1452 relating to all costs before the district court and K.S.A. 25-1451 relating to the ultimate resolution of this election contest.

K.S.A. 25-1452

K.S.A. 25-1452 governs the allocation of the costs of an election contest. It provides:

"If the election be confirmed or the contest be dismissed, judgment shall be rendered against the contestant for all costs. No costs shall be rendered against the contestee unless found responsible for any of the provisions in (a) through (f) of K.S.A. 25-1436. *The court, in the interests of justice may waive any costs assessed pursuant to this section in which case the costs shall be paid by the state from any appropriations therefor. Payment by the state shall be made by the director of accounts and reports upon voucher therefor approved by the clerk of the district court.*" K.S.A. 25-1452. (Emphasis added.)

The district court in this case waived costs, directing that they be paid by the State under K.S.A. 25-1452, and made a specific recommendation that costs include reasonable fees for both parties. The court held in part:

"3. In the interests of justice, the costs of this contest are hereby waived and should therefore be paid by the State of Kansas in a special appropriation made therefore, pursuant to K.S.A. 25-1452. It is the specific recommendation of this court that the costs of this case include a reasonable sum for attorney fees for both parties."

The first question we address is whether attorney fees are included as part of the costs under the provisions of K.S.A. 25-1452. The interpretation of a statute is a question of law, and this court's review is unlimited. *In re Tax Appeal of Boeing Co.*, 261 Kan. at 514. In interpreting a statute, the fundamental rule is that the intent of the legislature governs, where it can be ascertained. *Davey v. Hedden*, 260 Kan. 413, 419, 920 P.2d 420 (1996).

The term "all costs" under K.S.A. 25-1452 does not specifically include attorney fees. Neither the statute itself nor the Elections Act as a whole define what is meant by or included in the word "costs." See K.S.A. 25-101 *et seq.* Further, the legislative history

surrounding K.S.A. 25-1452 includes no discussion concerning what is meant by use of the term "all costs" in K.S.A. 25-1452. The statute was passed as part of Senate Substitute for H.B. 2619 in 1978. L. 1978, ch. 138, § 19. See Minutes of the Senate Elections Committee, March 23, 1978.

Attorney fees are not a part of costs, absent express statutory authority. See *Wolf v. Mutual Benefit Health & Accident Association*, 188 Kan. 694, 700, 366 P.2d 219 (1961). Attorney fees may be chargeable as costs where specific statutory provisions allow recovery. See *Allison v. Board of Johnson County Comm'rs*, 241 Kan. 266, 269, 737 P.2d 6 (1987). Where the legislature uses the word "costs," it means the fees and charges of the court such as filing fees, fees for service of process, and the like. See *Divine v. Groshong*, 235 Kan. 127, 141, 679 P.2d 700 (1984). Therefore, the use of the words "all costs" in K.S.A. 25-1452 does not include attorney fees. The district court acknowledged the same by recommending that costs include a reasonable sum for both parties' attorney fees.

The above conclusion is soundly supported by citing a few enactments by our legislature which have specifically addressed attorney fees in relationship to costs. See, *e.g.*, K.S.A. 16-1305 (stating that in action for violation of lawn and garden dealership agreement, the supplier will be liable to the retailer for "the actual costs of the action, including attorney, paralegal and expert witness fees"); K.S.A. 23-9313 (under Uniform Interstate Family Support Act, "[a]ttorney fees may be taxed as costs"); K.S.A. 26-509 (in eminent domain proceedings where the jury's verdict is greater than the appraiser's award, "the court may allow as court costs an amount to be paid to the landowner's attorney as attorney fees"); K.S.A. 50-505 (in injunction action by the attorney general or county attorney for unfair trade practices relating to dairy products, the court shall assess against the defendant "the costs, including reasonable attorney's fees)." In these above examples when deemed appropriate, the legislature explicitly authorized the awarding of attorney fees as part of costs. Absent such explicit authorization, attorney fees are not part of the costs in K.S.A. 25-1452.

The LCC argues that despite the legislature's failure to specifically include attorney fees in the definition of "costs" in K.S.A. 25-1452, it is included by implication in that the election contest process is a process which confers a substantial benefit upon the legislature and ultimately the people of Kansas. Thus, according to the LCC, K.S.A. 25-1452 falls under the "common benefit" exception to the general rule regarding attorney fees.

We need not dwell upon the "common benefit" exception to the general rule regarding fees. The rule creates what was at common law an equitable exception to the general rule that attorney fees are not recoverable absent statutory authority. See *Aguinaga v. United Food & Commercial Wkrs. Intern.*, 993 F.2d 1480, 1482 (10th Cir. 1993). This case deals with the specific provisions of K.S.A. 25-1452. Either the legislature intended that costs include fees or it did not. We have concluded that in accord with the law of this state, the intent of the legislature was not to include fees within costs under K.S.A. 25-1452. We are not at liberty to read into this statute a common-law rule based upon equitable principles that would be contrary to the intent expressed by the legislature in its adoption of K.S.A. 25-1452.

We conclude that the words "all costs" used in K.S.A. 25-1452 include the costs in this action in the amount of $1,630.12, but do not include attorney fees in the amount of $40,000. The initial effect of this ruling under the facts of this case and under K.S.A. 25-1452 means the "costs [exclusive of attorney fees] shall be paid by the state from any appropriations therefor." The costs in the amount of $1,630.12 constitute a valid obligation of the State under the provisions of K.S.A. 25-1452.

K.S.A. 25-1451

Our conclusion above does not end our inquiry concerning attorney fees. The legislature did not intend to include fees within the provisions of K.S.A. 25-1452. It is significant, however, that the legislature recognized that in some election contests there may be circumstances where the "interests of justice" would warrant that costs be paid by the State.

While the legislature delegated to the district court a discretionary decision on costs "in the interests of justice" in an election contest, it reserved unto itself the ultimate decision in such a contest:

"(a) When a contest of election is for the office of state senator or member of the house of representatives, the only question to be tried by the court, notwithstanding any other provision of law, shall be the question of what number of legally cast votes each of the candidates to the contested office received. The judge trying the proceedings shall make findings of fact upon the question so tried. Further evidence upon the points specified in the notice, including but not limited to the question as to the *eligibility of any person to office, shall be taken and preserved by the judge trying the contest, but the judge shall make no finding or conclusion thereon.* The clerk of the district court shall transmit all the files and records of the proceedings with all the evidence taken to the president of the senate or the speaker of the house of representatives, as the case may be.

"(b) In judging the election, returns and qualifications of any member of the house of representatives or senate, in the absence of rules providing otherwise, the *speaker* or president *shall appoint a select committee of equal numbers of members of the two parties having the greatest number of members of the entire senate or house of representatives as the case may be, and shall also appoint the chairperson and vice chairperson of the select committee.* The select committee shall consider the files, records and evidence transmitted from the court and *shall hear the contestant and contestee and their respective counsel.* Such select committee shall have powers of compulsory process and laws applicable thereto shall apply, except that all hearings shall be open. The select committee shall report to the full house of representatives or senate not later than ten days after its appointment. Such report shall be set for the special order of business within five legislative days from the date the report is made. All members shall have access to files, records and evidence transmitted from the court at such reasonable times as determined by the full house of representatives or senate. When the time of the special order of business arrives *the full house of representatives* or senate except the contestee *shall determine, after debate thereon, the person who is the elected member.*" (Emphasis added.) K.S.A. 25-1451.

Just as the legislature could delegate under the provisions of K.S.A. 24-1452 a discretionary decision on assessment of costs to the district court, so also may the legislature decide in its discretion that the "interests of justice" calls for assessment of attorney fees under the provisions of K.S.A. 25-1451. The legislature contemplated that the arguments of the contestant and his or her counsel be made to the select committee of the House and reported to the

full House of Representatives. See K.S.A. 25-1451. If the law contemplates representation of counsel, certainly the legislature retains the discretion to award such fees as it deems justice requires. Moreover, if the legislature vests in the district court discretion to determine whether the "interests of justice" warrant making the costs an obligation of the State, it stands to reason that the legislature, which makes the final decision in such a contest as the one presented here, could within its discretion award attorney fees "in the interest of justice."

(3) Whether the LCC is an agent of the legislature.

This issue is perhaps the key to resolving one of the most difficult aspects of this case. The parties discuss the doctrine of agency in common-law terms. The LCC is not a common-law agent of the legislature. Common-law concepts of agency do not apply in the relationship between the legislature and the LCC. Thus, the questions discussed by the parties in their briefs concerning whether the legislature ratified the acts of the LCC by not repudiating such acts have no place in this discussion. *Cf. Osborn v. Grego*, 226 Kan. 212, 216, 596 P.2d 1233 (1979).

The LCC is an administrative agency created by statute. Its power and authority are defined by law. As we stated in *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 378, 673 P.2d 1126 (1983): "Administrative agencies are creatures of statute and their power is dependent upon authorizing statutes, therefore any exercise of authority claimed by the agency must come from within the statutes. There is no general or common law power that can be exercised by an administrative agency."

The LCC is created by K.S.A. 46-1201 *et seq*. Its general powers and functions are established in K.S.A. 46-1202, which provides:

"The legislative coordinating council shall have general authority over all legislative services and such authority shall be exercised by such council as it shall determine, except as otherwise provided by chapter 46 of Kansas Statutes Annotated. *The legislative coordinating council shall represent the legislature when the legislature is not in session.* The legislative coordinating council may adopt and amend rules applicable to its affairs or to the meetings and activities of special committees, standing committees or advisory committees, except that such rules shall not apply to standing committees meeting while the legislature is in session. When the legislature is not in session, the legislative coordinating council shall

govern the mechanics and procedure of all legislative committee work and activities, except that of the interstate cooperation commission, legislative post-audit committee, state finance council and the ways and means of the senate and the committee on appropriations of the house of representatives . . . ." (Emphasis added.)

The language that the LCC is to "represent the legislature when the legislature is not in session" was added to K.S.A. 46-1202 in 1973. L. 1973, ch. 211, § 1. In the same bill, K.S.A. 1972 Supp. 46-1204 was amended to provide the LCC with the power to contract for legal services to represent itself and the legislature. See L. 1973, ch. 211, § 2.

Both amendments by the legislature as a whole were prompted by an attorney general's opinion concerning the powers of the LCC to submit vouchers to pay for professional legal services on behalf of the legislature. See Report on Kansas Legislative Interim Studies to the 1973 Legislature, Part 1, p. 220. The question addressed to the attorney general was whether the Joint Committee on Legislative Services and Facilities, a now abolished subpart of the LCC, had the authority to submit vouchers to the Accounts and Reports Division to pay for professional legal services rendered on behalf of the legislature in a federal reapportionment case. The Joint Committee requested that the vouchers be paid from appropriations made for legislative expenses. The attorney general concluded that power to pay attorney fees from expenses rendered on behalf of the legislature in a federal reapportionment case was beyond the power granted to the LCC:

"The question is whether the expenditure of these state funds for the legal services rendered is an authorized expenditure. It is our carefully considered judgment that the object of the requested expenditure, i.e., professional legal services rendered in the federal district court of Kansas in the referenced apportionment cases by this vendor, is beyond the power and authority of the Joint Committee, or the Legislative Coordinating Council of which the Joint Committee is subservient, to presently authorize, and accordingly you may not lawfully make the payment requested from the State Treasury. In other words, neither the Joint Committee nor the Council, whichever authorized the expenditure of funds for the purpose and object here in question, had the power, authority or standing to do so." VII Opinions of the Attorney General, p. 715 (1974).

To support this conclusion, the attorney general explored the legislative history behind the creation of the LCC and its subparts. He also examined the legislature's statutory grant of power to the LCC. The attorney general made the following conclusion regarding the scope of the LCC's authority:

"We believe the absolute maximum extent of the powers given to the Council, and correspondingly to the committees and offices subordinate thereto, authorizes only an organizational framework whereby the Legislature, through these agencies, assures that it has the necessary supportive services available to it to carry on its work, and to have necessary and pertinent data gathered, discussed and investigated so that informed recommendations may be made based upon the results of such findings. Further, after the Legislature has acted on the matters before it and laws are enacted, these legislative services may collate and correlate the new laws with the old so that members of the other branches of government and the public may better know what the law is and abide by the directions or prohibitions so expressed." VII Opinions of the Attorney General, p. 718.

The Report on Legislative Interim Studies following the above attorney general's opinion demonstrates that the legislature as a whole sought to clarify the powers of the LCC in response to the opinion:

"The particular need for these two amendments arose from adverse opinions of the Attorney General concerning action taken by the Legislative Coordinating Council to represent the interests of the legislature in reapportionment cases, but other matters may arise requiring prompt action by the Legislative Coordinating Council when the legislature is not in session." Report on Kansas Legislative Interim Studies to the 1973 Legislature, Part 1, p. 220.

It seems clear beyond dispute that the legislature intended by these amendments to confer the broad power and discretion in the LCC to act on the legislature's behalf when it was not in session.

We deal with an election contest for a seat in the Kansas House of Representatives that resulted in a tie vote; an election contest which must be decided by the legislature. See K.S.A. 25-1451. The legislature contemplated that the contestants will be represented by counsel and will appear before a representative committee of the legislature. K.S.A. 25-1451(b). The interest of the State and the legislature is clearly demonstrated in K.S.A. 25-1451 and 25-1452. Payment of fees *by the legislature* is unquestionably authorized. Payment *by the LCC when the legislature is not in session* is,

we conclude, also authorized. If the legislature wishes to restrict the powers clearly conferred upon the LCC it may do so by statute. Suffice it to say that to date, the legislature has sought only to expand and clarify the broad power and discretion of the LCC, not restrict them.

(4) Does the failure of the legislature to specifically pass S.B. 95 reveal legislative intent that costs and attorney fees in this matter not be paid?

The Senate refused to pass S.B. 95 that contained specific language for the appropriations of money to cover the costs and attorney fees for the contested election. The respondents claim that this failure signifies a legislative intent that such costs and fees not be paid. Can we give any weight to unpassed legislation that would have specifically authorized payment of the costs and fees in this case? The respondents argue that the legislature's silence, coupled with its failure to pass S.B. 95, signifies its intent to exclude payment of the vouchers from the general appropriation fund of H.B. 2085. We have in the past examined the failure of the legislature to pass a bill in seeking to determine legislative intent. See *Joe Self Chevrolet, Inc. v. Board of Sedgwick County Comm'rs*, 247 Kan. 625, 633, 802 P.2d 1231 (1990); *Jackson v. Jackson*, 217 Kan. 448, 452-53, 536 P.2d 1400 (1975); *Higgins v. Cardinal Manufacturing Co.*, 188 Kan. 11, 360 P.2d 456 (1961).

However, examination of the substantive nature of S.B. 95 reveals that it contained claims for fuel tax refunds, canceled warrants, and claims on the Department of Corrections among several other specific appropriations. Given the broad subject matter, we are unable to infer any legislative intent from the legislature's failure to pass the bill.

(5) Whether Article 2, § 24 of the Kansas Constitution prohibits payment of costs and fees.

Article 2, § 24 of the Kansas Constitution states: "No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law." This provision has been interpreted to mean that money belonging to the State and rightfully in the State treasury, and over which the legislature has the rightful control, cannot be withdrawn from the treasury except in pursuance

of an act of the legislature setting apart or assigning such money to a particular public use. This use must be specific in amount and specific in purpose to indicate to the public officials who are authorized to withdraw and use such funds the purpose to be accomplished by the appropriation. See *State, ex rel., v. Fadely*, 180 Kan. 652, 661, 308 P.2d 537 (1957).

The respondents contend that even if the LCC has the power to pay the costs and attorney fees in this matter, there must still be a specific appropriation. The respondents argue that the LCC has no power to make such an appropriation on its own and that the legislature has not made such an appropriation. The LCC contends that it is not necessary for the legislature to produce a line item list of expenditures that may come from an operations appropriation. The LCC argues that H.B. 2085 provides an operations appropriation which may be used to pay the costs and attorney fees in this case. We agree that the legislature need not enact a specific appropriation for costs and fees in this case unless those expenses are not within the legislative appropriations for operations, including official hospitality, as more fully set forth in L. 1994, ch. 255, § 3 (S.B. 510) and L. 1995, ch. 222, § 3 (H.B. 2085).

This is an elusive issue because its resolution does not help resolve the differences between the parties. We doubt that there is a genuine argument that a legitimate "operational expense" of the legislature may not be paid out of the general appropriation fund of H.B. 2085. In a recent case we said that "[t]he modern trend is to require less detailed standards and guidance to the administrative agencies in order to facilitate the administration of laws in areas of complex social and economic problems." *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 264 Kan. 363 Syl. ¶ 7, 956 P.2d 685 (1998). the question is not a general versus specific appropriation, but rather whether the payments of costs and attorney fees are an authorized expenditure from H.B. 2085, the general operating budget for the legislature. If it is determined that costs and fees in this election contest are legitimate operational expenses of the legislature, then there is no real dispute that such may not be paid by the LCC out of appropriations contained for those expenses in H.B. 2085. If on the other hand, costs and fees

are not authorized as operational expenses of the legislature, then all would agree that a specific appropriation would be required. Thus, the answer to the question raised is not whether the specific payment may be made out of the general appropriation, but rather whether the costs and fees are operational expenses falling within the provisions of H.B. 2085.

(6) Whether costs and fees qualify as an operational expense within the general appropriation fund of H.B. 2085.

H.B. 2085 states that the appropriated amount is for "[o]perations (including official hospitality)." L. 1995, ch. 222, § 3(a). The only clues to what the legislature meant to include in this category are that the bill provides that expenditures may be made from the account to pay compensation and travel expenses and subsistence expenses or allowances for members and associate members of the advisory committee to the Kansas Commission on Interstate Cooperation for attendance of meetings, and also for authorized expenditures for expenses, allowances, or payrolls for members, members-elect, or employees of the legislature or for expenses or allowances for nonlegislator members of certain committees, as well as payment for goods and services provided by state agencies, payment of dues and other expenses related to membership in national governmental organizations, acquisition of printed material supplies, acquisition of copy machine supplies, rental and lease purchase payments for copying machines, payment for replacement of furniture in legislative offices and committee rooms, and payments under the Kansas Prompt Payment Act. L. 1995, ch. 222, § 3(a). However, this is not meant to be an exhaustive list but is instead illustrative of the kinds of expenses that the operations money was designed to pay.

It is true that the bill does not expressly list that money appropriated in the bill can be used to pay the attorney fees and costs in this case. However, nothing in the Kansas Constitution requires such specificity in appropriations. Instead, the appropriation must simply be definite enough to advise those who are authorized to expend funds of the general purpose of the statute. See *Fadely*, 180 Kan. at 660-61. As a result, so long as the expenditure may be

categorized as within the purpose of the appropriation, the funds appropriated may be used for that expenditure.

The Kansas Attorney General has issued an opinion on the subject, concluding that appropriated funds may not be so used. See Att'y Gen. Op. No. 95-66. In that opinion, the attorney general stated:

"Section 3 of chapter 255 of the 1994 session laws [S.B. 510] and section 3 of H.B. 2085 provide appropriations for operations, including official hospitality, of the legislature. Therefore, in order to determine whether payment of the costs of the election contest may be paid from appropriations set forth in L. 1994, ch. 255, § 3 or H.B. 2085, it must be determined whether such costs constitute operations of the legislature. A fundamental rule of statutory construction is that the purpose and intent of the legislature governs. [Citation omitted.] It is presumed the legislature understood the meaning of the words it used and intended to use them in their ordinary and common meaning. [Citation omitted.] The Kansas Supreme Court has indicated operation of a public entity is 'to maintain it in a manner to effect accomplishment of results appropriate to the nature of the enterprise.' *Concordia-Arrow Flying Service Corp v. City of Concordia*, 131 Kan. 247, 250 (1930) (emphasis added). Indications of those items intended to be included as operations of the legislature are provided in the budget statements regarding the legislature. Such items include salaries and wages, contractual services, commodities, and capital outlay. The legislature has not included within appropriations for operations of the legislature costs incurred in the contest of an election. Therefore, the costs incurred in the contest of election in the seventy-ninth representative district may not be paid from appropriations set forth in L. 1994, ch. 255 § 3 or H.B. 2085."

The attorney general's opinion in this matter is not entirely a persuasive one. Although it correctly notes the expansive definition of "operations" that this court has applied in the past and gives examples of the types of expenses for which the bill specifically provides, it concludes without further discussion or support that the election contest costs in this case were not included in the very narrow definition of operations adopted in the opinion.

Att'y Gen. Op. No. 95-66 fails to examine the provisions of K.S.A. 25-1452 and the question of whether "costs" include attorney fees. Instead, the opinion concludes that "[t]he costs incurred in the contest of an election in the seventy-ninth representative district may not be paid from appropriations set forth in L. 1994, ch. 255, § 3 or H.B. 2085." Yet, the actual costs in this election

contest were, by the provisions of K.S.A. 25-1452 and the action of the Cowley County District Court, made a valid obligation of the State. Expenditures to satisfy a valid state obligation constitute an "operational" expense of the legislature.

Finally, Att'y Gen. Op. No. 95-66 fails to discuss the nature and powers of the LCC, which, as we have stated above, is the key to resolving the difficult aspects of this case. The opinion fails to address the provisions of an earlier attorney general opinion concerning the nature and authority of the LCC and a similar subject—payment of attorney fees from the legislative operational general appropriation for legislative expenses in a federal reapportionment case. See VII Opinions of the Attorney General, p. 714. In that opinion, the attorney general, after extensive discussion concerning the authority of the LCC, concluded that hiring professional legal services was beyond the power of the LCC. VII Opinions of the Attorney General, p. 715. Following that opinion, the legislature amended 46-1204 to clarify that such action was indeed within the LCC's power. See L. 1973, ch. 211, § 2; Report on Kansas Legislative Interim Studies to the 1973 Legislature, Part 1, p. 220.

We need not in this opinion define what is meant by operational expenses of the legislature. Suffice it to say that both costs and fees under the provisions of K.S.A. 25-1452 and K.S.A. 25-1451 were, according to the intent expressed by the legislature as implemented by the LCC, a valid obligation of the State. In its discretion, the LCC proposed that such obligations be paid from appropriations regarding the legislative appropriation for its operational expenses in H.B. 2085. The action by the LCC was based upon the interest of the State and was within the grant of authority of the legislature. It may also be noted that no party takes issue with the amount of the fees in this case and the action taken by the LCC was consistent with the recommendation of the trial court. Thus, we conclude that the vouchers represent a legislative expense that may be paid out of appropriations by the legislature in H.B. 2085 for operational expenses.

We, therefore, conclude that the payment of costs in this election contest is a valid obligation of the State (K.S.A. 25-1452); that

the fees are a legal obligation subject to the discretion of the legislature; that the LCC, representing the legislature, may in its discretion make such fees an obligation of the legislature as a whole; that payment of fees under the provisions of K.S.A. 25-1451 is supported by a valid State interest expressed by the legislature as a whole; that the LCC represents the legislature while the legislature is not in session; and that the expenditure is within the scope of authority granted by statute to the LCC. Thus, we conclude that the vouchers in question represent a valid expenditure from the operational budget of the legislature and constitute an operational expenditure under the provisions of H.B. 2085.

The respondents assert that even if it is determined that the payment of the vouchers from the operations account is authorized, H.B. 2085 appropriates funds for the payment of operational expenses incurred during the fiscal year ending June 30, 1996. The respondents contend that as the vouchers were not submitted until August 24, 1996, they are untimely. They also contend that since the expenses in question were incurred in late 1994 and early 1995, fiscal year 1995, they are not part of the operational expenses of fiscal year 1996.

The respondents' argument is without merit. First, the respondents misstate the date of the vouchers. It is clear from the undisputed facts that the vouchers were submitted August 24, *1995*, in fiscal year 1996. Thus, they were submitted for payment in the proper fiscal year as the appropriations. The only question may be that the money was not appropriated for the fiscal year in which the costs became an obligation of the legislature. The costs became a valid obligation on January 6, 1995, when assessed by the court. This would technically be fiscal year 1995. The respondents cite K.S.A. 75-3731 for the proposition that vouchers should be submitted in the same fiscal year as the expense was incurred. However, K.S.A. 75-3731 does not support the respondents' contention. The money to pay the vouchers was not appropriated until fiscal year 1996. The costs of this action under the provisions of K.S.A. 25-1452 became a valid obligation of the State on January 6, 1995. Fees in the discretion of the LCC were also made a legislative obligation. Both costs and fees continue to remain a valid obligation

of the legislature until paid. Accordingly, payment from appropriations in H.B. 2085 is authorized.

(7) Whether the respondents' refusal to pay violated the doctrine of separation of powers.

The LCC contends that the refusal of the respondents to pay the vouchers is a violation of the doctrine of separation of powers and an unconstitutional encroachment on the legislature's power to make appropriations. This contention is without merit. K.S.A. 75-3731 vests the Director of Accounts and Reports with the discretion to refuse to pay any account, bill, claim, refund, or demand when the director determines that it is not a valid obligation or was not incurred in accordance with applicable laws and rules and regulations. At the time the vouchers were refused, the director was in possession of an attorney general's opinion which advised that "the costs incurred in the contest of an election in the seventy-ninth representative district may not be paid from appropriations set forth" in H.B. 2085. Under these circumstances, we believe that the Department of Administration and Director of Accounts and Reports acted in accordance with sound discretion according to its statutory authority vested under the provisions of K.S.A. 75-3731. Although we have concluded that the director's interpretation of the law was incorrect in that the vouchers were valid obligations incurred in accordance with applicable laws, rules, and regulations, such action did not constitute a violation of the doctrine of separation of powers.

## CONCLUSION

We conclude that the LCC is entitled to the relief requested in its writ of mandamus. We grant the writ of mandamus and order the respondents to honor the vouchers submitted by the LCC for payment. For the reasons set forth above, we answer the parties' stipulated issues in the following manner:

I. A. Costs, including attorney fees, incurred in this election contest are valid and lawful obligations of the legislature for which funds may be expended from the legislature's operations appropriation.

I. B. H.B. 2085 contains general appropriations for the legislature which may be used for payment of Jones' and Shriver's court costs under K.S.A. 25-1452 and attorney fees as recommended by the Cowley County District Court and determined by the LCC.

II. A. The LCC is not a common-law agent of the legislature but is an administrative agency created by the legislature.

II. B. The legislative power of appropriation cannot be delegated under the Kansas Constitution, article 2, § 24. The respondents must honor LCC vouchers which are properly funded by legislative appropriation.

III. A. The respondents' refusal to pay the submitted vouchers as appropriated operational expenses is not a violation of the doctrine of separation of powers.

The LCC is charged with the general authority over legislative services when the legislature is not in session, including the authority to approve expenses of legislative committees and to purchase and contract for personal property and services. The LCC is granted the power to represent the legislature in matters requiring prompt action when the legislature is not in session. There are limits to the authority of the LCC. However, the ministerial duty of paying valid obligations of the legislature from moneys already appropriated for the operation of the legislature is in keeping with the LCC's duties and grant of power under the provisions of K.S.A. 46-1202.

Writ granted.